IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

T.L., by and through her father and                No. 03:13-cv-01562-HZ
next friend, SHAUN LOWRY; G.L., by
and through his father and next
friend SHAUN LOWRY; SHAUN LOWRY,
an individual; and ASHLEY LARSON,
an individual,

                    Plaintiffs,                    OPINION & ORDER

        v.

SHERWOOD CHARTER SCHOOL, an
Oregon public charter school, and
SHERWOOD CHARTER SCHOOL
BOARD,

                    Defendants.

Kevin C. Brague
KIVEL AND HOWARD, LLP
111 S.W. Fifth Avenue, Suite 1775
Portland, Oregon 97204

        Attorney for Plaintiffs

/ / /


1 - OPINION & ORDER

Steven A. Kraemer
Mark C. Sherman
HART WAGNER LLP
1000 S.W. Broadway, Twentieth Floor
Portland, Oregon 97205

     Attorneys for Defendants

HERNANDEZ, District Judge:

     Plaintiffs T.L. and G.L. challenge actions taken by Defendants Sherwood Charter School

(SCS) and the Sherwood Charter School Board when they were students at SCS.  T.L. and G.L.

appear through their next friend and father Shaun Lowry.  Lowry and Ashley Larson, formerly a

nanny to T.L. and G.L., are Plaintiffs themselves in one claim.

     Following the dismissal of several claims in a March 6, 2014 Opinion & Order granting

in part and denying in part Defendants' motion to dismiss, the following claims remain: (1) a

claim by T.L. for peer-on-peer sexual harassment under Title IX of the Education Amendments

of 1972, 20 U.S.C. § 1681 ("Title IX"); (2) a Title IX retaliation claim brought by all Plaintiffs;

(3) a 42 U.S.C. § 1983 claim by T.L. alleging a violation of her Fourteenth Amendment due

process rights; (4) an intentional infliction of emotional distress (IIED) claim by T.L.; (5) a

negligence claim by T.L.; and (6) disability discrimination claims by G.L. under Section 504 of

the Rehabilitation Act of 1983, 29 U.S.C. § 794(a), and Title II of the Americans with

Disabilities Act, 42 U.S.C. § 12132 (ADA).

     Defendants move for summary judgment on all claims.  I grant the motion.  As explained

below, the Title IX retaliation claims by Lowry and T.L. are the only claims in which questions

of fact create an issue for a jury.  However, because I agree with Defendants that Plaintiffs fail to

establish that SCS is the intended recipient of federal funds, I dismiss the Title IX retaliation

claims on that basis.  As to all other claims, Defendants are entitled to summary judgment because Plaintiffs fail to create an issue of fact on those claims.  Additionally, as to the other Title IX claims and G.L.'s Rehabilitation Act claim, these are alternatively dismissed because of the federal funding issue.

BACKGROUND

T.L and G.L. both attended SCS during the 2011-12 school year and part of the 2012-13 school year.  SCS is a small school with approximately 207 elementary and middle school students attending in the 2012-13 school year.  The SCS Board is the governing body of SCS, making decisions in areas such as finance and budgeting, the facility lease, the school's charter, setting policies, overseeing curriculum, and hiring a principal.  Jan Smith was SCS's principal during the 2011-12 school year.  Joy Raboli replaced her as principal beginning in the 2012-13 school year.

The claims in this case are primarily based on T.L's contention that she was sexually harassed by her peer K.L. who also attended SCS, and that SCS failed to take appropriate remedial action in response to her complaints about that harassment.  Additionally, in December 2012, because of an incident involving T.L., K.L., and Larson, Larson was restricted from volunteering in SCS's classrooms and T.L. was suspended from school for two days.  When Lowry complained about these actions, he allegedly was threatening and abusive to school staff, prompting Raboli to ban him from the SCS campus.  Finally, G.L., who has diabetes, contends that Defendants failed to reasonably accommodate his disability.

I.  The 2011-12 School Year

T.L. was in seventh grade in the 2011-12 school year.  During this year, T.L. was placed

in an entirely different class schedule than K.L. at the request of both Lowry and K.L.'s parent. Lowry Depo. (Ex. 1 to Sherman Decl.) at 120[1]; Pls.' Ex. 36 (Feb. 28, 2012 email from Lowry to teacher Baumer and principal Smith telling them that T.L. was complaining about K.L. making negative and vulgar comments to and about T.L. and requesting they be separated as much possible); Lint Decl. at ¶ 4 (noting that during the 2011-12 school year, K.L's parents requested that SCS keep K.L. and T.L. as far apart as possible because of T.L's frequent taunting of K.L.). According to Lowry, the 2011-12 school year issues were resolved. Lowry Depo. (Ex. 1 to Sherman Decl.) at 120.

II. The 2012-13 School Year

    A. September - November 2012

    T.L. began the 2012-13 school year at SCS but Lowry withdrew her in September of 2012, briefly enrolled her in an online school, then re-enrolled her at SCS several weeks later. In his deposition, Lowry stated he withdrew T.L. because the family was having a positive experience with the online program and because T.L. had voiced repeated concerns about "a particular student" at SCS who kept making "wildly inappropriate," offensive, sexually explicit comments to her. Lowry Depo. (Ex. 5 to Brague Decl.) at 112.

    However, Lowry also testified that when he notified SCS that he was withdrawing T.L., he did not tell SCS that the reason for the withdrawal was because of any rude or inappropriate comments being made to T.L. by K.L. Id. at 115. Lowry maintains that there were emails to the school alerting them to the issues with K.L. and which suggested, at some unspecified date in

---

    [1] Because deposition excerpts for several witnesses were provided by both Plaintiffs and Defendants, I cite to the Declaration to which the cited deposition excerpt is attached.

4 - OPINION & ORDER

time, that he was considering moving T.L. out of SCS. Id. at 112-15. There are no such emails in the record indicating that he made this complaint contemporaneous with T.L.'s withdrawal from SCS in September 2012. In October 2012, Lowry placed T.L. back at SCS because the online school's curriculum was not academically sufficient. Id. at 115-16. Lowry made no mention of any concerns with K.L. when requesting that T.L. be re-enrolled. Defs.' Ex. 8.

In the 2012-13 school year, completely different schedules for T.L. and K.L. were not an option because the eighth graders had to take courses at the same time. Lowry Depo. (Ex. 1 to Sherman Decl.) at 120-21. But, at some unspecified point, SCS staff assured Lowry that T.L. would be seated as far away as possible from K.L. Id. at 121.

In the 2012-13 school year, Paul Baumer was T.L's homeroom teacher and also had her for both math and social studies classes. Baumer Depo. (Ex. 7 to Sherman Decl.) at 25-26. T.L. described Baumer as her favorite teacher. T.L. Depo. (Ex. 23 to Sherman Decl.) at 17. Baumer noted that T.L. generally got along with her peers. Baumer Depo. (Ex. 7 to Sherman Decl.) at 25. T.L. did not complain to Baumer about any negative interactions with K.L. Id. at 48. Baumer rejected the assertion that negative interactions between T.L. and K.L. occurred "almost daily." Id. at 47-48. He did not hear profane terms used between K.L. and T.L. Id. at 48.

On or about November 6 or 7, 2012, an incident occurred in teacher Jasmine Jones's science class involving K.L., two other male students, and female student M.K. Raboli Decl. at ¶ 4; see also Lint Decl. at ¶ 5. The four students had been working together in a group. Id. Apparently, when one of the male students returned from the bathroom, K.L. asked him if he had an erection. Lint Decl. at ¶ 5; see also Raboli Decl. at ¶ 4 (male students were allegedly having inappropriate talk about erections). M.K. apparently told K.L. that his comment was

inappropriate, that he was an idiot, and nobody liked him.  Lint Decl. at ¶ 5.  K.L. allegedly

replied with a statement which M.K. understood to be threatening.  Raboli Decl. at ¶ 8 (M.K.

suggested that K.L. threatened her with his penis); but see Lint Decl. at ¶ 5 (stating that K.L. said

something to the effect of "[d]on't make me threaten you with my threats even though they are

harmless").  M.K., who made Jones aware of the incident, refused Jones's offer to be moved to a

different group and indicated she was alright.  Raboli Decl. at ¶ 4.  Jones moved K.L. to a

different group for class on the following day.  Id.

      Jones emailed K.L.'s mother Cammie Lint that afternoon to tell her about the incident and

that Jones was requesting lunch detention for K.L. the following week.  Lint Decl. at ¶ 7.  Raboli

then received an email from M.K.'s mother asking her to investigate the incident.  Raboli Decl. at

¶ 5.  Raboli interviewed several students.  Id. at ¶ 7.  The investigation yielded conflicting

information.  Id. at ¶ 8.  There was no clear evidence that K.L. sexually harassed M.K.  Id.  A

threat assessment was conducted to evaluate if K.L. was a threat to others or himself.  Id. at ¶ 7.

As per school district practice, the threat assessment was conducted by mental health care

coordinator Mary Massey with input from Raboli, SCS counselor Melinda Laus, K.L.'s own

behavioral specialist, and a school resource officer.  Id. at ¶ 9.  After reviewing K.L.'s discipline

record, the circumstances that led to the outburst, and whether there were particular risk factors

present, such as access to weapons, the team unanimously determined that K.L. was not a

credible threat to other students or himself.  Id. at ¶ 9.  Raboli, who as principal has responsibility

for suspensions and expulsions, suspended K.L. for 2.5 days in mid-November because of his

inappropriate comments to M.K. and the other male students.  Id. at ¶ 10.  And, before his return,

SCS implemented a safety plan for K.L. with input from the threat assessment team.  Id. at ¶ 12.

6 - OPINION & ORDER

This included  (1) restricting access between K.L. and M.K.; (2) assigning K.L. and M.K.
different passing periods; (3) seating K.L. and M.K. on opposite sides of their classrooms; and
(4) having K.L. and M.K sit away from each other during lunch.  Id.

Lint also received a phone call from the Sherwood Police Department informing her that
an anonymous caller reported that K.L. had threatened a female student with a sexual crime at
school and the school was doing nothing.  Lint Decl. at ¶ 9.  The officer took statements from
members of the Lint family.  Id.  The police determined no crime was committed.  Id.

Raboli informed the SCS Board about the incident in a November 15, 2012 letter.  Pls.'
Ex. 26.  There, Raboli described an incident in which the parent of a student appeared in her
office, with the student, accusing another student of threatening her by stating something to the
effect that he was going to hurt her with her penis.  Id.  Raboli recited the allegations and SCS's
response which included talking to K.L. who denied using the word penis and said he threatened
the student with a hug.  Id.  Raboli told the SCS Board that she had suspended K.L. for 2.5 days
and put a "threat assessment" in place.  Id.  Raboli also told the SCS Board that the Sherwood
Police Department investigated the incident as well and that the middle school community
became aware of the situation through social media.  Id.

On November 18, 2012, one day before K.L's November 19, 2012 return to SCS, Raboli
received an email from the parents of R.J., another SCS student, regarding issues between K.L.
and R.J.  Raboli Decl. at ¶ 16.  Then, on November 19, 2012, K.L.'s first day back after his 2.5
day suspension, K.L. had a threatening outburst at lunch.  Raboli Decl. at ¶ 13; Lint Decl. at ¶ 12.
This was apparently in response to information provided to K.L. that R.J. had called the police
over the incident between K.L. and M.K.  Lint Decl. at ¶ 12; Raboli Decl. at ¶ 13.  Raboli

suspended K.L. again, this time for three days.  Raboli Decl. at ¶ 14; Lint Decl. at ¶ 12.

The following day, on November 20, 2012, Raboli met with R.J.s' parents who informed her that K.L. had allegedly stabbed R.J. with a pencil.  Id. at ¶ 17.  R.J.'s parents could not provide Raboli with a specific date on which this alleged incident occurred.  Id.  Raboli told R.J.'s parents about the recent investigation of K.L., his suspension, and the safety plan.  Id. at ¶ 16.[2]

A second threat assessment was done.  Lint. Decl. at ¶ 15.  Although the team agreed that K.L. was not a threat to other students, a stricter safety plan was adopted.  Raboli Decl. at ¶ 14. This included assigning education assistant Vilena Raibley to be K.L.'s full-time, one-on-one aide to monitor his interactions with other students for safety purposes during the entire school day.  Raboli Depo. (Ex. 3 to Sherman Decl.) at 115-16; Raibley Depo. (Ex. 26 to Sherman Decl.) at 18; Raboli Decl. at ¶¶ 14, 15 (noting that the revised November 29, 2012 safety plan provided for Raibley to accompany K.L. at all times when he was in school and specifically at the drop off at school, passing times, PE, lunch, field trips, and seating); Lint Decl. at ¶ 15 (as part of the safety plan, K.L. was accompanied by an adult at all times).

B.  December 2012

On or about December 5, 2012, Lint allegedly confronted T.L. and two of her friends away from school grounds while Lint was driving and noticed the students walking.  Lowry Depo. (Ex. 1 to Sherman Decl.) at 141-42, 144-45; see also Lint Decl. at ¶ 16 (explaining Lint's version of the events).  T.L. called Lowry who came and picked her up.  T.L. Depo. (Ex. 23 to

---

[2]  The Declaration is unclear as to whether Raboli told them about K.L.'s investigation, suspension, and safety plan in response to the email or in the November 20, 2012 meeting. Raboli Decl. at ¶¶ 16, 17.

Sherman Decl.) at 14. Lowry then called the police. Id. That evening, Lint received a call from the Sherwood Police informing her that Lowry and T.L. were claiming that Lint had threatened and harassed T.L. Lint Decl. at ¶ 18. According to Lint, the police determined that no crime had been committed. Id.

The next day, Larson, the Lowry family nanny, volunteered in Jones's classroom during a technology class in which T.L. and K.L. were assigned. Larson sat with T.L. while K.L. was at a different table but close enough to hear the conversation between Larson and T.L. In a written statement, Jones recounted that Larson and T.L. were discussing the incident with K.L.'s mother which had occurred the previous afternoon. Defs.' Ex. 12. Jones observed and overheard that discussion. Id. K.L. also overheard the discussion and asked them to not talk about it because it "causes me to feel anxiety." Id. Jones then observed Larson roll her eyes and turn back to T.L. Id. Jones asked to speak to Larson outside the classroom where Jones told Larson that her behavior was inappropriate and that she was not welcome back in the classroom. Id. Jones advised Larson that she could speak to Raboli if she pleased. Id.; see also Defs.' Ex. 14 (written statement by Raibley describing her overhearing T.L. and Larson discussing the events of the previous day and that when asked to stop, they continued their discussion).

After students left the classroom, Jones called Raboli. Defs.' Ex. 12. During that conversation, Lowry and Larson stepped into the classroom. Id. According to Jones, Lowry said he wanted to talk to her about what had happened with Larson. Id. His tone was angry and irritated. Id. He told Jones she was condescending. Id. Jones's classroom was a portable building, separated from the church building housing the other parts of SCS. Jones requested to meet with Lowry and Larson inside the church building. Id. Jones and Lowry were both raising

their voices and her own tone was upset.  Id.  She felt physically unsafe to the point she was

shaking.  Id.  She was threatened by Lowry's size and his tone.  Id.  Jones told Larson and Lowry

that she was very upset about what had happened that day in class.  Id.  She recalled putting her

hand out in a "back away" motion at least three times during the conversation.  Id.  After that,

Larson and Lowry left and went to the church building.  Id.

On December 7, 2012, Lowry sent Raboli an email in which he stated that "a student in

Mrs. Jones's Technology class threatened to 'kill' another student this week."  Raboli Decl. at ¶

18.  Raboli asked Lowry to provide more details but does not recall receiving a response from

him.  Id.  She investigated the matter, including speaking with Jones and Raibley, and determined

that K.L. was not involved.  Id.  She learned that on December 4, 2012, Jones had discovered that

an email had been sent by one student to another which stated "I am going to kill you moda

fupa."  Id. at ¶ 19.  This was investigated and appropriate action was taken.  Id.; see also Raboli

Depo. (Ex. 16 to Brague Decl.) at 61-64 (Raboli testified that during the 2012-13 school year, she

learned of a threat by a student to kill another student which was investigated and for which

discipline was issued).  The incident did not involve K.L. or any Lowry family member.   Raboli

Decl. at ¶ 19.  Raboli does not know if that is the incident Lowry was referring to in his

December 7, 2012 email.  Id.

On or about December 11, 2012, Lowry emailed Raboli and T.L's teachers, affirmatively

requesting that T.L. and K.L. not be seated near each other in any of their classes.  Lowry Depo.

(Ex. 1 to Sherman Decl.) at 187-89; Pls.' Ex. 45 (referring to Dec. 11, 2012 email).  Raboli spoke

to her teachers and instructed them to keep T.L. and K.L. as separated as possible, including in

Jones's classroom.  Raboli Depo. (Ex. 3 to Sherman Decl.) at 182-83, 214-15, 220; Baumer

Depo. (Ex. 7 to Sherman Decl.) at 48-49, 56 (explaining that T.L. and K.L. were not near each other in his classroom); see also Pls.' Exs. 37 (Dec. 11, 2012 email from Baumer to Lowry stating that T.L. and K.L. were sitting apart in his classroom); 39 (Dec. 12, 2012 email from PE teacher Nora Stuckey to Lowry informing Lowry that K.L. and T.L are not in PE together); 40 (Dec. 12, 2012 email from Baumer to Lowry telling Lowry that T.L is sitting on the complete opposite side of the room from K.L., and that teachers Jones and Carlson "also have KL as isolated as we can have him in our rooms without having him outside" and further noting that "[i]ts just something all of us have to put up with").  In her subsequent monitoring of the classrooms, Raboli observed and confirmed that T.L. and K.L were not seated together.  Raboli Depo. (Ex. 3 to Sherman Decl.) at 183.  Nonetheless, on December 19, 2013, Lowry emailed the SCS Board to complain that T.L. and K.L. were not being separated in Jones's classroom.  Pls.' Ex. 45.

Meanwhile, on or about December 10, 2012, Lowry met with Raboli and school counselor Laus in Raboli's office.  During the meeting, Lowry's actions disturbed and concerned Raboli.  Raboli Depo. (Ex. 3 to Sherman Decl.) at 151.  Raboli described Lowry as talking over them, not listening to their answers, not trying to work towards a solution, and becoming hostile. Id.  Laus described Lowry as angry and intimidating.  Laus Depo. (Ex. 15 to Sherman Decl.) at 18.  When the meeting became unproductive, Raboli asked him to leave her office.  Raboli Depo. (Ex. 3 to Sherman Decl.) at 150.  Lowry refused.  Id.; Laus Depo. (Ex. 15 to Sherman Decl.) at 19.  He finally left after Raboli's fourth or fifth request.  Id. at 20-21; Lowry Depo. (Ex. 1 to Sherman Decl.) at 219-20 (Lowry acknowledges that he did not leave when he was asked to).  Laus was frightened by Lowry's tone of voice and wondered what he would do next.  Laus Depo. (Ex. 15 to Sherman Decl.) at 30.  Liljegren, the SCS secretary, was in the office next door and

also became frightened by Lowry's loud voice and refusal to leave the principal's office.

Liljegren Depo. (Ex. 9 to Sherman Decl.) at 34, 36.  Raboli talked with Laus about her personal

safety concerns around Lowry.  Laus Depo. (Ex. 15 to Sherman Decl.) at 24.  After the office

incident, Raboli told Liljegren that Lowry not leaving her office made her concerned about her

own personal safety and the safety of Laus.  Liljegren Depo. (Ex. 9 to Sherman Decl.) at 26.

Raboli investigated the December 6, 2012 incident in Jones's classroom involving Larson.

Because of Larson's classroom disruption, Raboli concluded that Larson would no longer be

allowed to volunteer at SCS.  Raboli Depo. (Ex. 3 to Sherman Decl.) at 144-46; see also id. at

146-47 (reciting other field trip or classroom disruptions by Larson); Baumer Depo. (Ex. 7 to

Sherman Decl.) at 31-34 (indicating that Larson had previously caused disruption when

volunteering on SCS field trips).

Raboli also suspended T.L. for two days, informing Lowry in a December 14, 2012 letter

that based on her investigation, she determined that T.L. had been taunting, bullying, and

harassing K.L.  Raboli Depo. (Ex. 3 to Sherman Decl.) at 156-57; Defs.' Ex. 13.  Raboli noted

that Larson herself stated that T.L. had talked loudly about Lowry getting a restraining order

related to the incident with Lint.  Defs.' Ex. 13.   T.L. was suspended from school on December

17 and 18, 2012,  Id.

Also on December 14, 2012, Raboli issued a no trespass order to Lowry based on the

hostile interactions between Lowry and SCS staff, including his entering the SCS office looking

for Raboli twice after the December 10, 2012 meeting.  Raboli Depo. (Ex. 3 to Sherman Decl.) at

176-77, 189; Defs.' Ex. 18.  Raboli continued to communicate with Lowry via email relating to

issues involving all three Lowry children.  Raboli Depo. (Ex. 3 to Sherman Decl.) at 188.

Several days after suspending T.L., Raboli reversed T.L's suspension and removed it from her permanent record because Raboli failed to give T.L. an opportunity to be heard and present her side of the story before suspending her.  Raboli Depo. (Ex. 3 to Sherman Decl.) at 157, 223-24.  SCS informed Lowry of this decision in a December 31, 2012 letter to his attorney because by then, Lowry had retained counsel and submitted a tort claim notice to SCS.  Defs.' Ex. 17.

C.  January 2013

In mid-January 2013, Raboli asked Liljegren to bring T.L. to Raboli's office to discuss an issue about "note-taking."  Raboli Depo. (Ex. 3 to Sherman Decl.) at 109.  During Jones's class, Jones noticed that T.L. was not performing the class-assigned task and after being asked, she still did not work on the task, prompting Jones to look at what T.L. was doing.  Jones Depo. (Ex. 12 to Brague Decl.) at 38-39.  In response to Jones's request, T.L. gave Jones the piece of paper.  Id. Jones made a copy of it and gave the original back to T.L.  Id. at 39.

In late December 2012, T.L's therapist suggested that she take notes when she felt harassed by the "other student."  Pls.' Ex. 25 (log completed by Raboli of January 14, 2013 meeting with T.L. and Laus in which Raboli wrote that T.L. "said her counselor told her to take notes."); Defs.' Ex. 21 at 3 (notes of therapy session dated December 19, 2012 with counselor Kristy Baker, Ph.D., in which Baker discusses with T.L. that when she feels harassed by the "other student," she could document what was said, when it was said, and who witnessed it). During the January 2013 meeting about the note taking, Raboli told T.L. that note taking was a violation of school policy as stated in the student handbook.  Raboli Depo. (Ex. 3 to Sherman Decl.) at 109-10; Defs.' Ex. 5 at 7 (SCS Student-Parent Handbook prohibiting note writing or passing at school); but see Raboli Depo. (Ex. 16 to Brague Decl.) at 113-114 (Raboli stated in

13 - OPINION & ORDER

deposition that note taking is not expressly listed in the Handbook's "Discipline Protocol" as a minor infraction but it could be viewed as "[b]eing disrespectful to peers" if it were shared with others).

Raboli told T.L. that she respected what her counselor had told her but that her note taking violated the rules and constituted bullying and harassment. Pls.' Ex. 25 (log of meeting by Raboli and separate log of meeting by Laus who was present). T.L. was warned that if it happened again, she would be suspended. Id. Both Raboli and Laus noted in their written description of this meeting that the meeting ended because T.L. wanted her father to be present and he was not allowed on campus. Id. T.L. was sent back to class with no other consequence or discipline. Laus Depo. (Ex. 15 to Sherman Decl.) at 43; Raboli Depo. (Ex. 3 to Sherman Decl.) at 111.

On or about January 23, 2013, Lowry withdrew T.L. and G.L. from SCS, but left his youngest child, M.L. enrolled there.

III. G.L.'s Disability and Accommodation

G.L. has diabetes. Raboli and her staff were trained in G.L.'s diabetes protocol by Sherwood School District Nurse Lisa Church. Raboli Depo. (Ex. 3 to Sherman Decl.) at 49-50, 131, 132, 133. Liljegren's duties included dispensing medication to sick or injured students and as part of those duties, Church trained her regarding G.L.'s diabetes protocol. Liljegren Depo. (Ex. 9 to Sherman Decl.) at 19, 21, 31, 43-44. She helped monitor his blood sugar. Id. As part of assisting G.L., Liljegren spoke often with Lowry about monitoring G.L.'s blood sugar. Id. at 21, 42. She also discussed maintaining G.L.'s diabetes checks with Raboli. Id. at 25. SCS maintained detailed logs that documented the monitoring of G.L.'s blood sugar levels. Id. at 44-

14 - OPINION & ORDER

45.

Church testified that there was a policy for ensuring that G.L. ate his lunch or ate the carbohydrates he had bolused for by having the lunchroom monitors make sure G.L. ate his lunch. Church Depo. (Ex. 24 to Sherman Decl.) at 39-40. Although she did not know if someone physically accompanied G.L. from the office, where he went before lunch, to the lunchroom to make sure he was actually eating his lunch there, if his subsequent monitoring showed that his blood sugar was high or low, Church would be notified and she would review the protocol with SCS staff. Id. at 40-41.

On one occasion in mid-November 2012, G.L. did not eat or finish his lunch, causing a lower blood sugar reading after he returned home that afternoon. Lowry Depo. (Ex. 1 to Sherman Decl.) at 151-53. Lowry told SCS about the lunch incident, which was the only time he ever told SCS about G.L. not getting enough to eat in relation to his diabetes. Id. at 155-56. Lowry did not take G.L. to the doctor because of the low blood sugar caused by the missed lunch. Id. Church is unaware of any other incident where a meal was missed or any incident where G.L.'s monitoring did not occur. Church Depo. (Ex. 24 to Sherman Decl.) at 37.

In response to the missed lunch, Raboli spoke to Liljegren to make her aware that G.L. did not eat his lunch. Raboli Depo. (Ex. 3 to Sherman Decl.) at 128. Although Liljegren was not in charge of G.L.'s lunch, Raboli wanted Liljegren to be aware of the missed meal. Id. Raboli also spoke to "the people at lunch" whom she described as including assistant Annie Sissens and teacher Nora Stuckey. Id. at 128-29 (naming the assistant and Stuckey as the usual "lunch people" who monitor and insure that all students, including G.L., eat their lunches). Liljegren also spoke to G.L. reminding him to eat everything in his lunch box every day. Liljegren Depo.

15 - OPINION & ORDER

(Ex. 9 to Sherman Decl.) at 53.

Church sent Lowry an email the day after the missed lunch, which was a Friday, and visited SCS the next Monday, determining that there had been a misunderstanding and that G.L. thought he was not supposed to eat in a certain place even though he had been given the freedom to do so. Defs.' Ex. 10 (Nov. 16 and 19, 2012 emails between Lowry and Church). Lowry thanked Church for her assistance. Id. Church also testified in deposition that when she went to the school regarding the incident, she spoke to Liljegren and clarified the protocol with G.L.'s teachers. Church Depo. (Ex. 24 to Sherman Decl.) at 41. She also encouraged G.L. to advocate for himself if he needed to finish his lunch and made sure he knew he was allowed to do that. Id. at 41-42.

G.L.'s blood sugar was tested consistently. Raboli Depo. (Ex. 3 to Sherman Decl.) at 129-30. G.L. never had a diabetic arrest during the 2011-12 and 2012-13 school years when he attended SCS. Lowry Depo. (Ex. 1 to Sherman Decl.) at 171. G.L. never went into a diabetic coma during his attendance at SCS. Id. There is no evidence that the Lowry family communicated with their doctor about any concern related to G.L.'s diabetes because of anything that did or did not happen at SCS. G.L.'s doctor never told Lowry that SCS was not following his diabetes protocol. Id. at 182-83.

In one other incident, G.L. left his PE class without telling his teacher, Stuckey. G.L. Depo. (Ex. 7 to Brague Decl.) at 41-42. He felt his blood sugar decreasing "and had to go to the office immediately to check my blood." Id. at 41. He conceded at deposition that it would have taken only about five seconds to tell Stuckey he needed to go to the office for a medical reason and he could have done that if he wanted to, but he "thought my blood sugar was important" and

it was "very urgent." Id. (Ex. F to Sherman Reply Decl.) at 42, 45-46.  Lowry testified that he understood that G.L. left the class without telling Stuckey, went to the restroom, and then proceeded to the office to have his blood checked.  Id. (Ex. 5 to Brague Decl.) at 164.  G.L. could not remember if he actually received a punishment or if Stuckey just spoke to him.  Id. (Ex. F to Sherman Reply Decl.) at 46-47.  He indicated in his deposition that even if he received a punishment, it was for leaving without telling Stuckey, not because he needed to check his blood. Id. at 44.  He agreed that he did not feel well, but conceded that he was not on the verge of passing out.  Id. at 45.  He could not remember whether he went to the bathroom first, but he agreed that if he had, he would have had time to tell Stuckey he was leaving.  Id. at 48.

STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial."  Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted).  The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial.  Bias v. Moynihan, 508 F.3d 1212, 1218

17 - OPINION & ORDER

(9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. Suever v. Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1112 (9th Cir. 2011).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## DISCUSSION

As noted above, the following claims remain in the case: (1) a Title IX claim by T.L. for peer-on-peer sexual harassment; (2) a Title IX retaliation claim brought by all Plaintiffs; (3) a section 1983 claim by T.L. alleging a violation of her Fourteenth Amendment due process rights; (4) an IIED claim by T.L.; (5) a negligence claim by T.L.; and (6) disability discrimination claims by G.L. under the Rehabilitation Act and the ADA. I address the claims in turn, followed by a discussion of SCS's receipt of federal funds.

## I.  T.L's Title IX Peer-on-Peer Sexual Harassment Claim

Title IX prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a). However, because Title IX's prohibition is limited to instances of intentional discrimination, see Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 638, 642-44, 648-49 (1999), Defendants are liable for peer-on-peer harassment "on the basis of sex" only if they were deliberately indifferent to the alleged harassment. Thus, to be liable on the Title IX claim, Defendants must have (1) had

actual knowledge of, and (2) been deliberately indifferent to, (3) harassment "on the basis of sex" that was so severe, pervasive, and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by Defendants' school.  See Davis, 526 U.S. at 644-645, 650.

Defendants argue that the harassment was not sufficiently severe to violate Title IX, that the District was not deliberately indifferent in any event given the responses it took to complaints about K.L., and that T.L. was not deprived of any educational benefits or opportunities provided by SCS.  Because I agree with Defendants on the issue of deliberate indifference, I do not address the other issues.

In the 2011-12 school year, SCS learned of a problem between T.L. and K.L. in February 2012 when Lowry and Lint both contacted the school asking the two students be separated.  This was remedied to Lowry's satisfaction by having T.L. and K.L. in separate schedules.  Lowry Depo. at 119-20 (issues from 2011-12 school year were resolved).

The record establishes that Defendants did not have knowledge of continuing problems with K.L. until November 2012 when K.L. made an inappropriate in-class statement about erections which initiated a chain of events involving SCS, M.K., her parents, R.J., his parents, and reports to the police.  None of these events involved T.L.  It was not until December 2012 that Lowry himself told Defendants of any ongoing problems between K.L. and T.L.

Although Plaintiffs cite to evidence in the record to support their assertion that Defendants knew that K.L. had behavioral issues and would insult and use vulgar language toward other students, including T.L., the record, when actually examined, does not completely support Plaintiffs' assertion.  For example, Plaintiffs cite to Baumer's deposition testimony and

19 - OPINION & ORDER

Deposition Exhibit 46.  The cited testimony contains Baumer's disagreeing with the assertions made by Lowry in Lowry's February 28, 2012 email, disagreeing with Lowry's representations regarding the frequency of the comments made by K.L. to T.L., and disagreeing with the allegation that K.L. had called T.L. a "bitch."  Baumer Depo. (Ex. 7 to Sherman Decl.) at 47:13-18.  Deposition Exhibit 46 is Lowry's February 28, 2012 email.  Brague Decl. at ¶ 37 (stating Deposition Exhibit 46 is Plaintiffs' Exhibit 36 which is a copy of the email).  The only reasonable inference from these citations is that Lowry believed that K.L. made negative and at times vulgar statements to and about T.L. and that he notified Defendants of this on February 28, 2012.  While this does provide evidence that Lowry notified Defendants about a problem in February 2012, the record indisputably establishes, as previously noted, that the issues in the 2011-12 school year were resolved to Lowry's satisfaction.  In another citation, Plaintiffs rely on T.L.'s deposition testimony that K.L. called her various vulgar names every day for more than two years.  T.L. Depo. (Ex. 6 to Brague Decl.) at 7:23-8:5, 17:13-15.  But, the cited testimony does not indicate that she told Defendants.

The record establishes that in the 2011-12 school year, Defendants knew, in February 2012, of a problem between T.L. and K.L. and they resolved it.  In 2012-13, while there are allegations that K.L.'s conduct continued in the same fashion as it had occurred in the 2011-12 school year, there is no evidence that before mid-November 2012, Defendants were aware of any harassment issues with K.L.  Further, there is no evidence in the record that before early to mid-December 2012, Defendants were aware of any ongoing sexual harassment issues between K.L. and T.L.  As a result, the evidence, even when construed in a light most favorable to T.L., produces only one reasonable conclusion: Defendants were not deliberately indifferent.

20 - OPINION & ORDER

The Ninth Circuit has made clear that to be actionable under Title IX, an educational institution's response to harassment must be "'clearly unreasonable in light of the known circumstances[.]'" Oden v. N. Marianas Coll., 440 F.3d 1085, 1089 (9th Cir. 2006) (quoting Davis, 526 U.S. at 648). "In other words, we must decide whether, on this record, one could find that the College made 'an official decision . . . not to remedy the violation.'" Id. (quoting Gebser v. Lago Vista Ind. Sch. Dist., 524 U.S. 274, 290 (1998)). Negligent or careless conduct is not deliberate indifference. Id. And, that the remedy imposed by the educational institution is not the preferred remedy of the victim does not create an issue of fact with regard to deliberate indifference. Id.

In response to M.K.'s complaint in November 2012, SCS conducted an investigation and suspended K.L. for 2.5 days, even though the investigation failed to establish conclusively that he had threatened her with his penis. SCS also had a threat assessment performed by a team of professionals including a mental health specialist, a counselor, Raboli, K.L's own behavioral specialist, and a school resource officer. This occurred within a week or two of M.K's complaint. Based on input from the threat assessment team, the school put a safety plan in place which restricted access between K.L. and M.K.

When K.L. made another threat on his first day back after the suspension for the M.K. incident, he was suspended again and another threat assessment was performed. This time, Raboli hired an aide to accompany K.L during the school day upon his return to school. When Lowry emailed Raboli on December 11, 2012 to request that T.L. and K.L. not be seated near each other in any of their classes, Raboli spoke to the teachers and instructed them to keep the two as separated as possible. The evidence in the record establishes that the two were separated

21 - OPINION & ORDER

in all classes thereafter, as much as possible, with the possible exception of Jones's class. Although Raboli states that she observed them separated in that class and Baumer emailed Lowry to tell him that Jones had K.L. as isolated as possible without moving him outside, both Lowry and Dayna Lowry complained that the two were not being separated in Jones's class. For the purposes of this motion, this Court accepts that the two were not completely separated in Jones's class.

Finally, when Lowry made a formal complaint to the SCS Board on or about December 19, 2012 regarding the suspension of T.L., the no trespass order issued to Lowry, and the ban on Larson's volunteering at SCS, Pls.' Ex. 44, the SCS Board allowed him time before the regular session of the Board on or about December 19, 2012 to voice his complaint. Christensen Depo. (Ex. 6 to Sherman Decl.) at 43, 52-53, 69. Although there is a dispute about how much time the Board allotted to him, there is no dispute that the Board heard from him very shortly after he filed his complaint and that same night created a three-member committee to investigate his complaint. Id. at 43-44. Approximately nine or ten days later, Lowry filed a tort claim notice. Defs.' Ex. 17. The SCS Board attempted to interview T.L, but got no response from Lowry's attorney. Simas Depo. (Ex. 19 to Sherman Decl.) at 70-71; Christensen Depo. (Ex. 6 to Sherman Decl.) at 15. Nonetheless, the SCS Board continued its investigation and issued a preliminary report only two months after Lowry filed his complaint. Simas Depo. (Ex. 19 to Sherman Decl.) at 72, 75-76 (on or about February 12, 2013, SCS Board made its preliminary findings based on the information it had); Christensen Depo. (Ex. 6 to Sherman Decl.) at 51-52. One month later, Lowry filed this action.

It cannot be disputed that Defendants acted reasonably in light of the known information.

Defendants resolved the issues between T.L. and K.L. in the 2011-12 school year.  Once they were told by Lowry in December 2012 of persisting issues between T.L. and K.L., they separated the two students as much as practicable.  Even assuming T.L. and K.L. were not separated as far as possible in Jones's classroom after being notified by Lowry that issues between the two students persisted, K.L. was accompanied by Raibley during this time.  In response to incidents with other students, Defendants suspended K.L., had a threat assessment performed, adopted a safety plan, suspended him again, had another threat assessment performed, and hired Raibley as a full-time aide to accompany K.L.  The Board also responded promptly to Lowry's formal complaint, allowing Lowry at least some time in person to speak at the Board's next meeting and creating a committee to investigate the allegations.  Other than expelling K.L, the remedy T.L. preferred, there is not much more Defendants could have done.  Oden and other cases make clear that a harassment victim's disagreement with the punishment imposed on the harasser by the school does not create an issue of fact and does not establish deliberate indifference.  As a result, Defendants are entitled to summary judgment on T.L.'s Title IX peer-on-peer sexual harassment claim.[3]

## II. Title IX Retaliation Claims

To prevail on a Title IX retaliation claim when a claimant lacks direct evidence of retaliation, the claimant must establish a prima facie case of retaliation by showing that (1) he or she engaged in protected activity; (2) he or she suffered adverse action by the defendant; and (3) there is a causal connection between the two.  Emeldi v. Univ. of Or., 698 F.3d 715, 724 (9th Cir.

---

[3]  And, as explained below, they are also entitled to summary judgment on this claim because of the federal funding issue.

2012), cert. denied, 133 S. Ct. 1997 (2013). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate legitimate, non-retaliatory reasons for its actions. Id. If the defendant does so, the plaintiff must then show that the reasons proferred by the defendant are pretextual. Id.

In the Title IX context, the plaintiff must show that he or she was retaliated against because he or she complained of sex discrimination. Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 184 (2005) (to prevail in a retaliation claim under Title IX, a plaintiff must show that defendants retaliated against her because she complained of sex discrimination); Cannon v. Univ. of Chi., 441 U.S. 677, 694 (1979) (Title IX protects "persons discriminated against on the basis of sex"). That is, the protected activity must be that the plaintiff complained of sex discrimination and not other conduct.

This claim is brought by all four Plaintiffs: Lowry, Larson, T.L., and G.L. Defendants argue that none of them can establish a prima facie case because the record contains no evidence that any of the Plaintiffs complained about sex discrimination before the alleged retaliation occurred. Defendants also argue that they had a legitimate nondiscriminatory reason for their actions and that there is no evidence of pretext.

A. Protected Conduct - Complaints of Sex Discrimination

Plaintiffs generally refer to "Mr. Lowry's 2011/12 complaint to Defendants of K.L.'s harassing behavior toward T.L." Pls.' Resp. at 16. As noted above, the only evidence of a complaint by Lowry to Defendants in the 2011-12 school year regarding K.L.'s behavior toward T.L. is Lowry's February 28, 2012 email to Baumer and Smith. As noted above, T.L. and K.L. were given separate schedules in response to that email and Lowry testified that the issue in

2011-12 had been resolved.  While conceivably the February 28, 2012 email could be seen as a complaint of sex discrimination, and thus, protected conduct, it is only by Lowry, not any of the other three Plaintiffs, and, more importantly, the record does not establish that any retaliation occurred in response to that complaint.[4]

Lowry contends his September 2012 withdrawal of T.L. was due to the resumption of issues between K.L. and T.L. at the commencement of the 2012-13 school year.  But, the record fails to show that he told Defendants that his withdrawal of T.L. at that time was due to conduct by K.L.  Thus, at this point, Defendants had received no communication from Lowry regarding any "sex discrimination" being perpetrated by K.L. to T.L.  And, when he re-enrolled T.L. in October 2012, he made no comments and raised no concerns about K.L's behavior to T.L.  Accordingly, at least until late November 2012 or early to mid-December 2012, there appears to be no evidence in the record of any "sex discrimination" complaints made by Lowry to Defendants in the 2012-13 school year.

Plaintiffs suggest that the December 5, 2012 incident with Lint was the initiation of some sort of sex discrimination complaint by Lowry.  Plaintiffs argue that the incident gave rise to Lowry seeking "immediate assistance" from Defendants and this occurred in the context of other parents making multiple complaints about K.L.  But, what other parents complained about is not at issue here because this claim concerns only alleged retaliatory conduct by Defendants taken

---

[4]  And, in any event, Plaintiffs cannot show a causal link between this February 28, 2012 email and any retaliation which occurred almost ten months later.  While timing can be evidence of causation, too much time has elapsed between this email and the issuance of the no trespass order against Lowry to create an inference of causation and Plaintiffs have no other evidence of causation.  Thus, Plaintiff cannot establish a retaliation claim based on the February 28, 2012 email.

against Lowry and the other Plaintiffs for their sex discrimination complaints.  The December 5, 2012 incident with Lint does not establish that Lowry complained about sex discrimination at that point.

On December 6, 2012, Lowry and Larson confronted Jones after Jones asked Larson to leave her classroom.  There is no evidence that Lowry or Larson complained about sex discrimination or harassment in this encounter.

On that same date, Lowry emailed Raboli, thanking her for updating him on meeting with T.L.  Ex. 2, Lowry Decl.  He wrote that "[T.L.] (and other students) has 'put up' with [K.L.'s] vulgar and threatening behaviors almost daily for 2 years.  I hope that comes to an end very soon. But the harassment by a parent on a minor is illegal, unethical, and wildly inappropriate especially given that is that very threatening behavior from her son that has caused problems at SCS!"  Id.

Defendants argue that although the December 6, 2012 email mentions K.L.'s "vulgar and threatening" behavior, it provides no specifics regarding T.L. and does not ask SCS to do anything addressing sexual harassment.  I agree with Defendants that this email does not expressly raise a complaint but instead makes a factual assertion that K.L. has engaged in vulgar and threatening behavior for two years.  I also note that the word "vulgar" does not necessarily convey a sexual meaning.  See Webster's Third New Int'l Dictionary 2566 (1993) (defining "vulgar" to mean first "of the mob, of the common people, common" and also to mean "lacking in cultivation, perception, or taste," as well as "coarse," "rude," "morally crude," or "lewd, obscene, or profane in expression or behavior").  Furthermore, Lowry expresses no dissatisfaction with SCS's response to any particular situation.  However, construing the evidence

26 - OPINION & ORDER

in a light most favorable to Plaintiffs, the email must be interpreted as making a complaint about sexual harassment by K.L. toward T.L.

Lowry's December 7, 2012 email to Raboli about a student who had allegedly threatened to kill another student made no mention of sexual harassment or discrimination. Pls.' Ex. 43. There is no evidence that his December 10, 2012 meeting with Raboli and Laus concerned sex discrimination complaints. It is possible that his December 11, 2012 email requesting that T.L. and K.L be seated apart from each other be viewed, if interpreted in a light most favorable to Plaintiffs, as a complaint of sex discrimination or harassment but, while there are references to the email, a copy of the actual email does not appear to be in the record. Thus, this Court cannot say one way or the other whether the December 11, 2012 email is a complaint of sexual discrimination or harassment. Nonetheless, the December 6, 2012 email is enough to show that Lowry engaged in protected conduct.

As to Larson, T.L., and G.L., there is no evidence establishing that any of them made a sex discrimination or harassment complaint to Defendants before any of the alleged retaliatory conduct occurred on December 14, 2012 when Raboli suspended T.L., issued the no trespass order to Lowry, and prohibited Larson from volunteering at the school. Thus, only Lowry meets his burden of establishing that he engaged in protected conduct.

B. Legitimate Non-Discriminatory Reason

Defendants argue that SCS had legitimate, nondiscriminatory reasons to prohibit Larson from volunteering, to issue the no trespass order to Lowry, and to suspend T.L. for two days. The record supports Defendants. As recited previously, Jones found Larson's presence in her classroom the afternoon of December 6, 2012 to be disruptive and Raboli, who investigated the

incident, informed Lowry on December 14, 2012 that Larson would not be allowed in the

classrooms.  As to T.L., Raboli determined that the conversation with Larson on the afternoon of

December 6, 2012 in K.L.'s presence about the previous day's incident with K.L.'s mother and

which continued despite requests by K.L. to stop, was taunting and bullying of K.L.  And, as to

Lowry, the record establishes that Jones, Raboli, Laus, and Liljegren all felt intimidated by him

and feared him.  These are all legitimate, nondiscriminatory reasons for Defendants' actions

toward Lowry, Larson, and T.L.

      C.  Pretext

Plaintiffs contend that evidence from SCS staff and Board members attesting that Lowry

was not demeaning or disrespectful to them, or that they were not intimidated by him, shows that

the no trespass order was a pretext for retaliation toward Lowry for his protected conduct.  E.g.,

Baumer Depo. (Ex. 9 to Brague Decl.) at 23-24 (Baumer stated that Lowry was not demeaning or

disrespectful to Baumer and Baumer did not observe Lowry acting that way toward other SCS

employees); Church Depo. (Ex. 11 to Brague Decl.) at 16 (Church stated that she did not feel

intimidated by Lowry).  And, in response to Smith's testimony that she had been warned by

Sherwood School District liaison Brian Putnam about Lowry being demeaning and disrespectful

as well as aggressive and confrontational (information she passed on to Raboli when Raboli took

over as principal in the 2012-13 school year), Plaintiffs assert that Putnam has no recollection of

having that conversation with Smith.  Smith Depo. (Ex. 2 to Sherman Decl.) at 21-22; Raboli

Depo. (Ex. 3 to Sherman Decl.) at 78-79.  Putnam Decl. at ¶ 2.

I disagree with Plaintiffs that this evidence suggests pretext.  The fact that some members

of the SCS community may not have observed confrontational or disrespectful behavior by

Lowry does not create an issue of fact regarding the incidents on which Raboli based her December 14, 2012 decisions.  Without evidence that Lowry was treated differently than other parents who engaged in similar actions, the fact that others failed to see similar behavior in different contexts does not show pretext.  I reject Lowry's argument that pretext is created because Defendants treated Lint differently when they did not issue her a no trespass order or restrict her from campus despite her "accosting" three students on the way home from school. Lint and Lowry were not similarly situated because Lint's actions on December 5, 2012 were not directed toward school personnel and did not occur on school property.  Thus, the fact that no restrictions were issued to Lint prohibiting her from entering school property does not establish pretext.

Nonetheless, pretext can be shown by temporal proximity between the protected conduct and the alleged retaliation.  E.g., Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (noting that when courts accept "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case, they uniformly hold that the temporal proximity must be 'very close.'"); Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1065 (9th Cir. 2002) (in employment discrimination case, court confirmed that timing alone can satisfy the third prima facie factor of causation when "adverse employment action follows on the heels of protected activity[,]" but the court noted it would not necessarily apply in every case).

Here, the protected conduct is Lowry's December 6, 2012 email.  He received the no trespass order only eight days later, on December 14, 2012.  This is sufficient to create an inference of pretext.  But for the issue of federal funding, discussed below, Lowry's claim for

Title IX retaliation would survive summary judgment.

Under the theory of "third-party retaliation," T.L.'s Title IX retaliation claim would similarly survive summary judgment. In a 2011 case, the Supreme Court discussed the issue of "third-party retaliation" in the Title VII context. Thompson v. N. Am. Stainless, LP, 562 U.S. 170, 131 S. Ct. 863 (2011). There, the Court held that an employee could bring a Title VII claim on the basis of retaliation that he suffered in response to protected activity engaged in by a co-worker who was a close family member. Id. at 867-69. The plaintiff and his fiancée were both employed by the same employer. After the plaintiff's fiancée filed an administrative complaint alleging sex discrimination against herself, the employer terminated the plaintiff's employment several weeks later. Id. at 867.

The Court applied a "zone of interest" test under which a plaintiff has standing to sue where he "falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." Id. at 869 (internal quotation marks omitted). The test "den[ies] a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." Id. (internal quotation marks omitted). A plaintiff has standing to sue if she possesses an interest that Congress arguably sought to protect when enacting Title VII, while excluding from suit "plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions in Title VII." Id. (internal quotation marks omitted).

Applying the zone of interest test, the Supreme Court concluded that the plaintiff had standing to sue because "the purpose of Title VII is to protect employees from their employers'

unlawful actions." Id.  Also, the plaintiff was not an accidental victim of his employer's

discriminatory acts, nor were his injuries collateral damage caused by the same unlawful acts.  Id.

Rather, "hurting [the plaintiff] was the unlawful act by which the employer punished his fiancée.

Id.

     None of the parties in the instant case addresses this issue.  Assuming that Thompson

applies in the Title IX context, T.L. has a third-party retaliation claim based on a sex

discrimination complaint made by Lowry because she, as the student, is clearly in the "zone of

interest" intended to be protected by Title IX.  Moreover, because parents commonly advocate on

behalf of their children in schools, it is reasonable to conclude that the statute protects the student

from retaliation for the parent's protected activity.

     In a very recent Ninth Circuit case, the court affirmed a district court finding that the

Plaintiffs, members of a women's high school softball team, suffered "judicially cognizable

injuries flowing from [the school's] retaliatory responses to Title IX complaints made by their

parents and [their] [c]oach." Ollier v. Sweetwater Un. High Sch. Dist., 768 F.3d 843, 866-67

(9th Cir. 2014).  The court cited Thompson in recognizing that students fall "within the 'zone of

interests' that Title IX's implicit antiretaliation provisions seek to protect." Id. at 866.  Ollier

supports the conclusion that T.L. can bring a Title IX claim for retaliatory conduct directed at her

for a Title IX protected complaint made by Lowry.

     In contrast, there is no support for extending the "zone of interest" to Larson.  As the

children's nanny, she is not within the "zone of interests" sought to be protected by Title IX as

she is neither the student or the parent of a student.  Therefore, unless she engaged in protected

conduct herself, retaliation directed at her is not actionable on a third-party retaliation theory.

Even accepting as true that Defendants retaliated against her because of Lowry's protected conduct, she does not have a claim.

Regardless of the federal funding issue, summary judgment is granted to Defendants as to Larson's and G.L's Title IX retaliation claims.[5]  But for the federal funding issue, summary judgment to Defendants on Lowry's and T.L.'s Title IX retaliation claims would be inappropriate. However, as discussed in Section VII of this Opinion, Plaintiffs fail to establish that SCS is the intended recipient of federal funding and thus, summary judgment is granted to Defendants on all of the Plaintiffs' Title IX retaliation claims.

III.  Due Process Claim

As pleaded in the Second Amended Complaint, the 42 U.S.C. § 1983 claim is both a procedural and substantive due process claim.  Sec. Am. Compl. at ¶ 34 (alleging that Plaintiffs were denied basic due process contentions including notice and hearing before being denied liberty and property interests in a public school education); Id. a ¶ 35 (Plaintiffs denied substantive due process right to property and liberty interests in a public education).  Following the motion to dismiss, only T.L.'s due process claims remain.

Defendants move for summary judgment arguing that T.L. fails to establish that Defendants had a custom, practice, or policy of suspending students without due process.  Monell v. Dep't of Social Servs. 436 U.S. 658, 690-92, 694-95 (1978) (local governmental entities liable under section 1983 only when challenged conduct occurred pursuant to an expressly adopted official policy or a longstanding practice or custom).  Additionally, Defendants contend that even

---

[5]  There is no evidence in the record that any retaliatory conduct was directed at G.L. Thus, his claim fails for this reason, even when considered under a third-party retaliation theory.

if T.L. establishes such a custom, practice, or policy, she received adequate post-deprivation

process when her suspension was removed from her record.  Because I agree with Defendants on

the Monell issue, I do not address the post-deprivation process issue.

Plaintiffs do not rely on a custom or practice theory.  Rather, they suggest that there is an

issue of fact as to whether SCS had an official policy regarding due process rights in connection

with suspensions and to the extent SCS did not have such a policy, the failure to have a policy

violates section 1983.[6]

The SCS Student-Parent Handbook has a section entitled "School Policies."  Pls.' Ex. 20

at 2, 16-26.  Within that section is a policy on "Exclusion from School" which addresses

suspension and includes the following language: "[i]n case of a suspension, the student is

informed of the suspension charges by the administration and asked to explain his/her view of the

event.  When the decision to suspend is made, parents are notified and a procedure for

reinstatement and appeal is explained."  Defs.' Ex. 5 at 21.  A separate subsection, under the

heading "Consequences," addresses "Suspension" and indicates that suspensions may be in-

school or out-of-school.  Id. at 29.  It gives examples of what types of conduct can result in either

type of suspension.  Id.

Raboli testified that the Student-Parent Handbook contained a "shortened, easy-to-read

version of the school policies."  Raboli Depo. (Ex. 3 to Sherman Decl.) at 48-49.  This was

separate from the SCS Policies kept in a binder in the SCS office.  Id.; see also id. at 53-54

_____

[6] This "failure to have a policy" theory is not alleged in the Second Amended Complaint
which asserts that SCS had an "unofficial policy, custom or practice of suspending students
without an opportunity to know of the charge against them, having an opportunity to rebut such
charges, and timely notifying parents of the suspension and reasons supporting the suspension."
Sec. Am. Compl. at ¶ 32.

(Raboli testified that SCS has policies and a Student Handbook and has a discipline framework within its policies).

Additionally, SCS had a separate publication entitled "School-wide Discipline System" which discusses the school's philosophy of and approach to discipline. Pls.' Ex. 21. It states that suspension or expulsion is a last resort which is assigned on an individual basis and further, that SCS "follows the Sherwood School District policies." Id. at 4; see also Pls.' Ex. 20 at 16 (Student-Parent Handbook stating at the beginning of the section on "School Policies" that "[s]tudents are responsible to follow all policies under the Rights and Responsibilities section of the Sherwood School District School Board Policies."). Raboli testified that in the 2012-13 school year, the policies of the Sherwood School District regarding student discipline and other issues were the policies of SCS. Raboli Depo. (Ex. 16 to Brague Decl.) at 100-02. Some of these policies are in Plaintiffs' Exhibit 23. The District's policy for student discipline states that

> [a] student whose conduct or condition is seriously detrimental to the best interests of the school may be suspended or expelled in accordance with administrative procedures and rules established by the superintendent. Such rules and procedures will ensure careful consideration of the rights and needs of the individual concerned, as well as the best interests of other students and the school program as a whole.

Pls.' Ex. 23 at 2.

The District's policy on "Student Rights and Responsibilities" affirmatively represents that students have rights by virtue of the state and federal constitutions. Id. at 3. It spells out several specific rights, including the "right to due process of law with respect to suspension, expulsion . . . ." Id. Based on this evidence, Defendants argue that at the time T.L. was suspended, SCS had constitutionally appropriate discipline policies in place as set forth in the

34 - OPINION & ORDER

Student-Parent Handbook and in the District's policies.

In response, Plaintiffs make various assertions in support of their position that SCS had no relevant policies at the time T.L. was suspended. But, the cited evidence fails to support Plaintiffs' position. First, Plaintiffs assert that Defendants have a Student-Parent Handbook which contains statements of school operations, but no policies. The evidence in the record flatly contradicts this assertion because, as explained above, the Student-Parent Handbook contains a section entitled "School Policies." Pls.' Ex. 20 at 2, 16-26. The Student-Parent Handbook also refers to the policies of the District. Id. at 16.

Plaintiffs next assert that Raboli and SCS Board members testified that school policies were not adopted or in place until 2013. Raboli testified that SCS did not formally adopt its own policies until 2013, but it is clear from her testimony that she meant a formal adoption of policies by the SCS Board specific to SCS only. She further explains that at the time of the relevant events, SCS relied on the District's policies by default. Raboli Depo. (Ex. 16 to Brague Decl.) at 48, 49, 53-54, 100-02. Additionally, as noted above, the Student-Parent Handbook section on School Policies refers to the policies of the District and the SCS "School-wide Discipline System" publication expressly states that in regard to suspension or expulsion, SCS "follows the Sherwood School District policies."

The cited testimony from SCS Board member Renee Simas concerns the 2012-13 SCS Annual Report. Simas explains that in the Annual Report, the SCS Board identified areas where it could develop stronger, clearer policies and noted that it had been relying on District policy for its complaint process. Simas Depo. (Ex. 17 to Brague Decl.) at 58-59. Simas stated that the SCS Board recognized that the complaint process needed development specifically for SCS. Id. She

35 - OPINION & ORDER

also testified that when the new policies were being adopted in August 2013, she recommended that the complaint policy be clarified and brought up the issues of documentation and communication of disciplinary actions.  Id. at 176-77.  This testimony does not support Plaintiffs' assertion that there were no school policies until 2013.

SCS Board member Jenelle Christensen testified that when she was the chair of the SCS Board, SCS did not have its own set of policies for dealing with complaints.  Christensen Depo. (Ex. 10 to Brague Decl.) at 36-37.  Again this testimony does not support the assertion that school policies generally, or policies specific to discipline, were not in place until 2013.  It concerns only policies regarding complaints, not discipline, and does not create an issue of fact regarding SCS's reliance on the District's policies.  See id. at 37 (stating that SCS relied on District policies).

Even construed in a light most favorable to Plaintiffs, the cited evidence shows that while SCS did not have a complete set of SCS-specific policies until August 2013, at the time T.L. was suspended SCS had school policies and had expressly adopted and relied on the District's policies, including the District's discipline policies.  It is unreasonable to draw an inference from this evidence that there were no school policies until 2013.

Next, Plaintiffs assert that at the time Raboli was hired in the summer of 2012, Defendants had not adopted any policies.  This assertion is belied by the evidence just discussed. The only additional evidence cited by Plaintiffs in support of this particular assertion is the testimony by Simas that as of December 2012, SCS had not adopted a policy regarding parent complaints.  Pls.' Resp. at 21 (citing Simas Depo. at 46).  This does not create an issue of fact regarding a policy on discipline.

36 - OPINION & ORDER

Finally, Plaintiffs assert that it was "Defendants' custom and practice to allow principals to decide the discipline and suspension of students attending Defendants' school[.]" Pls.' Resp. at 20.  The cited testimony is supportive of the proposition that the SCS Board did not have responsibility for the day-to-day operations of SCS and that it did not have responsibility for student discipline.  Simas Depo. (Ex. 17 to Brague Decl.) at 25-27 (adding that the SCS Board was responsible for distributing a student handbook that outlines the discipline policy and for making sure the policies are posted).  Christensen testified that in regard to the development of a "safety plan" for a particular student, it was up to the administration and teachers to implement that plan and follow up on it and that this was not a Board responsibility.  Christensen Depo. (Ex. 10 to Brague Decl.) at 57-58.  She also agreed that it was the responsibility of the principal and teachers to determine the discipline of the students and that this was also not a Board responsibility.  Id. at 58 (further agreeing that it was not the Board's responsibility to step into the day-to-day discipline of the students).

Board member Kimberly Young testified that the Board was not responsible for direct management of students.  Young Depo. (Ex. 19 to Brague Decl.) at 26.  Finally, Raboli testified that the principal has a duty to have a working knowledge of the school's policies, including what constitutes mild or aggressive behaviors and the consequences for those behaviors.  Raboli Depo. (Ex. 16 to Brague Decl.) at 54, 93.

The evidence shows that the Board delegated day-to-day responsibility for running the school, including the imposition of discipline, to the teachers and the principal.  The evidence does not show that anyone other than the SCS Board made policy for the school.  Additionally, it is irrelevant that Defendants had a custom or practice of allowing principals to make decisions

about discipline, including suspension.  The custom, policy, or practice at issue in this claim is one of violating students' due process rights in the context of suspensions.  The SCS Board's custom, policy, or practice of delegating day-to-day running of the school to the teachers and principal does not show a custom or practice of due process violations or a lack of student discipline policies in place at the time T.L. was suspended.

Plaintiffs fail to create an issue of fact regarding whether there were policies in place in 2012 regarding student discipline.  As a result, T.L. cannot rely on a "failure to have policies" theory.  Instead, she must show that despite an official policy affirmatively guaranteeing compliance with constitutional due process protections, Defendants had an unofficial, longstanding practice or custom deviating from the official policy and suspending students without a hearing.  This argument also fails.

Although Raboli admits she made a mistake in not talking to T.L before suspending her, Raboli Depo. (Ex. 3 to Sherman Decl.) at 157 (investigation into December 6, 2012 incident was not thorough because Raboli "missed the step for T.L. to be heard"), a "single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom." Christie v. Iopa, 176 F.3d 1231, 1235 (9th Cir. 1999) (holding that the plaintiffs could not "satisfy the requirement of a longstanding practice or custom, because they allege to the contrary that a county official has singled them out for unique treatment."); see also Marsh v. Cnty. of San Diego, 680 F.3d 1148, 1159 (9th Cir. 2012) (isolated instance insufficient to establish Monell liability); Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method

of carrying out policy").

Alternatively, Plaintiffs raise, for the first time, a "final policymaker" theory.  Even though a single act by a final policymaker can establish <u>Monell</u> liability, <u>see</u> <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 123 (1988) (plurality opinion), at this stage of the case, following the close of discovery with trial set in February, I am not inclined to allow Plaintiffs to amend their Second Amended Complaint to include a theory that Raboli was a "final policymaker" in regard to discipline <u>policies</u>.  Moreover, the evidence Plaintiffs rely on supports only that Raboli oversaw day-to-day operations of the school, including issuing discipline, and that the Board did not run those day-to-day operations.  The evidence does not support a conclusion that Raboli was the final policymaker in regard to SCS's disciplinary policies.  In fact, the SCS Board's formal adoption of its own policies in 2013 undermines any assertion that Raboli was the final policymaker.

Finally, Plaintiffs suggest that Defendants are liable based on a "ratification" theory under which <u>Monell</u> liability can be established if the final policymaker ratifies a subordinate's decision and basis for it.  <u>City of St. Louis</u>, 485 U.S. at 127; <u>see also</u> <u>Gillette v. Delmore</u>, 979 F.2d 1342, 1348 (9th Cir. 1992).  First, Plaintiffs failed to allege <u>Monell</u> liability on this basis in their Second Amended Complaint and as with the final policymaker argument, I am not inclined to allow amendment at this stage of the litigation.  Second, the only evidence in the record to support their theory is the testimony by Simas that she supported Raboli's decision to suspend T.L.  Simas Depo. (Ex. 17 to Brague Decl.) at 65-66.  There is no suggestion in this testimony that Simas knew that Raboli had not interviewed T.L.  There is no representation in this testimony that the SCS Board approved of the suspension.  There is no representation in this

39 - OPINION & ORDER

testimony that the SCS Board ratified a suspension without a hearing. This testimony does not

support a ratification theory. Additionally, in a December 31, 2012 letter to Lowry's counsel

from SCS's then-counsel, SCS acknowledged the possibility that it failed to implement T.L.'s

suspension in a legally proper manner and thus it removed the suspension from T.L.'s record.

Defs. Ex. 17. The facts simply cannot support a ratification theory.

Because there is no <u>Monell</u> liability against Defendants, I grant summary judgment to

Defendants on the due process claim.

IV.  IIED Claim

To prevail on her IIED claim, T.L. must establish that (1) Defendants intended to cause

severe emotional distress or knew with substantial certainty that their conduct would cause such

distress; (2) Defendants engaged in outrageous conduct; and (3) Defendants' conduct in fact

caused Plaintiff severe emotional distress. <u>House v. Hicks</u>, 218 Or. App. 348, 357-58, 179 P.3d

730, 736 (2008). Defendants move against the IIED claim on the basis that T.L. fails to establish

any of the three required elements.

Defendants argue that the evidence fails to raise an issue regarding their intent. Intent in

an IIED claim requires that the defendant desired to inflict severe emotional distress or knows

that such distress is certain, or is substantially certain, to result from his conduct. <u>Babick v. Or.</u>

<u>Arena Corp.</u>, 333 Or. 401, 412, 40 P.3d 1059, 1064 (2002). Negligent or reckless conduct does

not suffice. <u>See</u> <u>Logan v. West Coast Benson Hotel</u>, 981 F. Supp. 1301, 1322 (D. Or. 1997).

"Because proof of intent is often indirect and evidence of psychic harm is usually

self-serving, proof of this tort largely turns on the second element, whether a defendant's conduct

is sufficiently outrageous." <u>House</u>, 218 Or. App. at 358, 179 P.3d at 736. As the court in <u>House</u>

explained:

> A trial court plays a gatekeeper role in evaluating the viability of an IIED claim by assessing the allegedly tortious conduct to determine whether it goes beyond the farthest reaches of socially tolerable behavior and creates a jury question on liability. . . .
>
> . . .
>
> The classification of conduct as "extreme and outrageous" depends on both the character and degree of the conduct. As explained in the *Restatement* [*(Second) of Torts*] at § 46 comment d [1965]:
>
>> "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."
>
> Whether conduct is an extraordinary transgression is a fact-specific inquiry, to be considered on a case-by-case basis, based on the totality of the circumstances. We consider whether the offensiveness of the conduct exceeds any reasonable limit of social toleration, which is a judgment of social standards rather than of specific occurrences.

House, 218 Or. App. at 358-59, 179 P.3d at 736 (internal quotation marks and citations omitted)). Additionally, as I explained in the March 6, 2014 Opinion, "[r]elevant contextual factors include whether the parties are in a 'special relationship,' whether the alleged 'conduct was undertaken with an ulterior motive or to take advantage of an unusually vulnerable individual,' and the 'setting in which the conduct occurs, for example, whether it occurred in a public venue or in an employment context[.]'" Mar. 6, 2014 Op. at 20 (quoting House, 218 Or. App. at 360, 179 P.3d at 737).

In response to the motion, T.L. relies on the following facts: (1) Defendants knew that T.L. and K.L. were to be separated due to a safety plan as had been done the prior year but despite that plan, "Defendants allowed K.L. to regularly interact with T.L. and other female

41 - OPINION & ORDER

students which interaction was severe sexual harassment"; (2) Defendants suspended T.L. and required that she write a letter of apology to K.L. who had been tormenting her since the prior year; and (3) when T.L. was coping with K.L's behavior by taking notes as instructed by her therapist, Defendants confiscated her personal notes and disciplined her. Plfs.' Resp. at 28-29.

As has been noted several times already, the record shows that T.L. and K.L. were separated in 2011-12 by giving them different schedules because of requests by parents of both children. The record does not show that this separation was part of a formal "safety plan." When the 2012-13 school year began, different schedules were not an option. Although T.L. alleges that K.L. was making inappropriate comments to her daily, SCS was not on notice of a problem between these two students until late November or December 2012. If the school was unaware of a continuing issue between the two students, it is unreasonable to conclude that the school was intentionally inflicting emotional distress on T.L. by failing to separate her from K.L. While the conduct may have been negligent or even reckless, it cannot be interpreted as intentional. See Seiwert v. Spencer–Owen Comm. Sch. Corp., 497 F. Supp. 2d 942, 957 (S.D. Ind. 2007) (court granted summary judgment to defendant on IIED claim when plaintiff alleged that defendant had failed to respond to two years of bullying including the principal's having told the plaintiff not to take the threats seriously, a teacher failed to intervene when students began assaulting the plaintiff, and the assistant principal removed the plaintiff rather than discipline the bullies; court concluded that facts could show negligence, but did not support a conclusion that the behavior was "atrocious and utterly intolerable in a civilized society.").

Second, the suspension was not extreme and outrageous conduct. Assuming that a suspension is traumatic and socially stigmatizing to the student as Plaintiffs assert, that alone

42 - OPINION & ORDER

does not make a suspension of a student the basis of an IIED claim. Raboli determined that T.L. had engaged in inappropriate behavior and suspended T.L. for her actions. T.L. challenged the suspension because Raboli failed to talk to her before she suspended her, not because T.L. denied the allegations on which the suspension was based. Moreover, as suggested in my March 6, 2014 Opinion in discussing this claim, actions typically taken by school staff in the course of performing their education-related responsibilities, including disciplinary actions, even if negligent or reckless, should not been seen as inflicting extreme emotional distress unless accompanied by particularly appalling facts. See Mar. 6, 2014 Op. at 22 (specifically mentioning the allegation in the Second Amended Complaint that Defendants "confiscated, copied, and distributed T.L.'s personal journal she maintained at home" as actions "outside of those typically made by school employees"); see also Sabol v. Walter Payton Coll. Prep. High Sch., 804 F. Supp. 2d 747, 758-59 (N.D. Ill. 2011) ("no sensible person" could characterize school's conduct in questioning and suspending student as establishing IIED; "test is not any distress, but rather severe emotional distress," and what student experienced fell below that standard); Bass ex rel. Bass v. Miss Porter's Sch., 738 F. Supp. 2d 307, 327-30 (D. Conn. 2010) (IIED claim failed in part because alleged actions including school's insistence that student leave campus immediately at night, to serve a three-day suspension insufficient to establish school's conduct was outrageous or atrocious).

Third, the allegations in the Second Amended Complaint about the note taking are not supported by the record. Rather than "confiscating, copying, and distributing T.L.'s personal journal she maintained at home," the record shows that T.L. was taking notes on a piece of paper in class and Jones noticed she was off-task. Jones took the paper, made a copy of it, and returned

43 - OPINION & ORDER

the original to T.L.   There is no evidence that this was a "personal journal" T.L. "maintained at

home."  It was not "confiscated."  Although the note taking was at the suggestion of T.L.'s

therapist, there is no evidence that T.L. was actually disciplined for taking the notes.

Finally, while a "special relationship" is not an element of an IIED claim, the presence of

a special relationship is relevant to whether the alleged conduct is outrageous and extreme.

Plaintiffs argue that T.L. and Defendants have a special relationship and in the motion to dismiss

context, I assumed the presence of that relationship.  On summary judgment, however, I reject

Plaintiffs' argument.

As I explained in the March 6, 2014 Opinion,

Defendants are correct that no Oregon case has held that a special
relationship exists between a public school and a public school student him- or
herself, much less between the parent of the student and the school.  In Doe ex rel.
Farley, Piazza & Assocs. v. Gladstone Sch. Dist., No. 03:10-cv-01172-JE, 2012
WL 2049173, at *13 (D. Or. June 6, 2012), Judge Jelderks rejected the plaintiff's
argument that the plaintiff and her public school enjoyed a "special relationship"
because of state law mandating school attendance and because of the defendants'
*in loco parentis* status during the school day.  Judge Jelderks distinguished Shin v.
Sunriver Preparatory Sch., Inc., 199 Or. App. 352, 111 P.3d 762 (2005), which
found a special relationship between a private boarding school and a student under
very specific circumstances.

Although Shin indicates that the determination of a special relationship is
"driven by the facts," id. at 366, 111 P.3d at 770, I conclude that as a matter of
law, Oregon courts have not, and would not, recognize a special relationship
between a public charter school and a student's parent.

Mar. 6, 2014 Op. at 21.

Defendants argue that T.L and SCS are not in a special relationship and that the
alleged conduct is not sufficiently outrageous to support an IIED claim.  Although
I agree with Defendants that the courts have not recognized a special relationship
between a public school and a public school student, as noted above, determining
whether a special relationship exists has been described as a "fact-driven process,"
Shin, 199 Or. App at 366, 111 P.3d at 770 ("[w]hether a relationship is special is

44 - OPINION & ORDER

driven by the facts"), making  resolution of the issue inappropriate on a motion to dismiss for failure to state a claim.  This is an issue more properly resolved on summary judgment especially because SCS is alleged to be a public charter school and thus, it may or may not possess distinguishing facts beyond those seen in the typical public school - student relationship addressed in Gladstone School District and which are relevant to the special relationship determination.  Thus, at this point, I assume, without deciding, that there is a special relationship between T.L. and SCS.

Id. at 22.

Shin concerned a claim by a private boarding school student.  The court there described the school's unique educational environment:  "Sunriver Prep was not at all like a typical high school; it was, in the words of its president, a 'boarding school' that 'act[ed] in the parental role' for plaintiff and others who lived in the International House and with homestay parents, whom the school specially approved."  Shin, 199 Or. App. at 367, 111 P.3d at 770.  The "homestay agreement vested in the [homestay parents] a profound level of control over plaintiff's life" and "included the expectation that homestay parents must know the student's whereabouts at all times and authorized homestay parents to resolve conflicts with the student according to a particular template requiring the parents' involvement[.]" Id. at 367-68, 111 P.3d 771-72.  Additionally, the record showed that the school exercised independent judgment on the plaintiff's behalf when the homestay parents took the plaintiff to a doctor and made efforts to protect the plaintiff from her abusive father, including hospitalizing the plaintiff when she expressed feeling suicidal.  Id. at 368, 111 P.3d at 772.

No facts such as these are presented in the record here.  Plaintiffs cite no evidence distinguishing SCS from a typical public school.  This case is no different from Gladstone School District which held that there is no special relationship between a public school and its students.

45 - OPINION & ORDER

Gladstone Sch. Dist., 2012 WL 2049173, at *13.  I agree with Judge Jelderks's reasoning in

Gladstone School District and I apply it here.

    Even when viewed in a light most favorable to Plaintiff, the facts fail to establish that

Defendants' conduct constituted an "extraordinary transgression of socially tolerable conduct,"

McGanty v. Staudenraus, 321 Or. 532, 563, 902 P.2d 841, 849 (1995).  There is also no issue of

fact regarding the lack of Defendants' intent.  Therefore, summary judgment on T.L.'s IIED claim

is granted.

V.  Negligence Claim

    For the reasons already explained in the March 6, 2014 Opinion on the motion to dismiss,

T.L. must support her negligence claim by establishing that a special relationship exists between

her and Defendants.  Mar. 6, 2014 Op. at 30-31.  For the reasons discussed in connection with

the IIED claim, I determine that no special relationship exists.  T.L.'s reliance on Fazzolari v.

Portland Sch. Dist. No. 1J, 303 Or. 1, 734 P.2d 1326 (1987) is misplaced.  Fazzolari created a

new analysis for negligence claims under Oregon law which required examining whether there

existed "a status, a relationship, or a particular standard of conduct that creates, defines, or limits

the defendant's duty," or whether a defendant's conduct "unreasonably created a foreseeable risk

to a protected interest of the kind of harm that befell the plaintiff."  Id. at 17, 734 P.2d at 1336.

In the context of applying the new standard to the facts in that case, the court noted a school's

"duty of supervision" which it then referred to as the "special duty arising from the relationship

between educators and children entrusted to their care[.]" Id. at 19, 734 P.2d at 1337.  But,

Fazzolari involved physical injuries to a student and there was no discussion of any special

relationship in regard to non-physical injuries.  The law is clear that the physical impact rule

46 - OPINION & ORDER

applies to bar a negligence claim absent a special relationship and no such special relationship

between a student and the student's school has been recognized in that context.  As Judge

Jelderks explained in <u>Gladstone School District,</u>

> [w]hile schools have a "duty of supervision" towards their students that imposes
> "an obligation of reasonable precautions against foreseeable risks beyond those
> that might apply to other persons," the determination of a school's negligence is
> still one based on the "foreseeable risk of harm" and not on a *separate* legally
> protected interest.  <u>Fazzolari</u>, 303 Or. at 20[, 734 P.2d at 1337].

<u>Gladstone Sch. Dist.</u>, 2012 WL 2049173, at *13.

I grant summary judgment to Defendants on T.L.'s negligence claim.

## VI.  G.L.'s Disability Discrimination Claims

In the Second Amended Complaint, G.L. brings a claim under Title II of the ADA for

failure to reasonably accommodate his diabetes, alleging that

> [a]s a result of SCS's deliberate refusal to accommodate G.L's diabetes and to
> manage his diabetes in light of the known circumstances, G.L. suffered emotional
> distress, embarrassment, humiliation, anxiety, stress, and fear, and ultimately, loss
> of a public school education, all to his economic and noneconomic damage in an
> amount to be proven at trial.

Sec. Am. Compl. at ¶ 48.  He makes an identical claim under the Rehabilitation Act.  <u>Id.</u> at ¶ 42.

G.L.'s claims are properly understood as "reasonable accommodation" discrimination claims.

"Discrimination includes a failure to reasonably accommodate a person's disability."  <u>Sheehan v.</u>

<u>City & Cnty. of S.F.</u>, 743 F.3d 1211, 1231 (9th Cir. 2014) (discussing the ADA), <u>cert. granted,</u>

2014 WL 2196080 (U.S. Nov. 25, 2014) (No. 13-1412); <u>Mark H. v. Hamamoto</u>, 620 F.3d 1090,

1097 (9th Cir. 2010) (Rehabilitation Act).

Title II of the ADA and the Rehabilitation Act both prohibit the exclusion of a qualified

individual with a disability from the participation in, or the denial of the benefits of, services,

programs, or activities of a public entity. 42 U.S.C. § 12132 (ADA); 29 U.S.C. § 794

(Rehabilitation Act). To prove that a public program or service violated Title II of the ADA, a

plaintiff must show: (1) he is a "qualified individual with a disability"; (2) he was either excluded

from participation in or denied the benefits of a public entity's services, programs, or activities, or

was otherwise discriminated against by the public entity; and (3) such exclusion, denial of

benefits, or discrimination was by reason of his disability. Duvall v. Cnty. of Kitsap, 260 F.3d

1124, 1135 (9th Cir. 2001). Similar standards apply to the Rehabilitation Act claim. Id.; see also

Mark H., 620 F.3d at 1097-98 (explaining that to establish that defendant violated section 504 of

the Rehabilitation Act by denying the plaintiffs reasonable accommodation, plaintiffs had to

show: (1) they needed disability-specific services to enjoy meaningful access to the benefits of a

public education, (2) the defendant was on notice that the plaintiffs needed those specific

services, but did not provide those services, and (3) the specific services were available as a

reasonable accommodation).

Defendants move for summary judgment against G.L.'s disability discrimination claims

because, they contend, they are based on a single incident which caused G.L. no harm, was

promptly addressed by SCS, and did not deprive him of any appropriate education benefits.

In response, Plaintiffs argue that there was not just a single incident:

> There was inadequate supervision of G.L. during lunch time. The school
> disciplined G.L. for checking his blood sugar, even though it was the appropriate
> course of action. There was inadequate supervision to make sure G.L. left from
> [the] office and checked his blood sugar and bolused to eating lunch and ingesting
> the appropriate amount of carbohydrates. Notably, there are significant
> consequences for low blood sugar including loss of consciousness and seizures.

Pls.' Resp. at 26 (citations omitted). Again, however, Plaintiffs' assertions are not supported by

48 - OPINION & ORDER

the record.

It is true that there are two incidents.  As to the alleged "discipline" for checking his blood sugar, the record establishes that G.L. left his class without telling the teacher because he felt unwell, and may have received discipline or Stuckey may have just spoken to him.  Even if he received some sort of unspecified discipline, G.L. admitted that it was because he left without telling his teacher, not because he checked his blood sugar.  Thus, the record does not establish that he was disciplined for checking his blood sugar.  There is no evidence that anything related to this incident resulted in an exclusion from participation in or the denial of the benefits of SCS's services, programs, or activities.

As to the one time when G.L. did not eat his lunch, the record establishes that G.L. had a diabetes protocol which required the lunch room staff to ensure he ate his lunch.  It is undisputed that the single incident when G.L. did not eat or finish his lunch occurred because of a misunderstanding.  If there were a problem with implementation of the protocol, Church testified that it would show up in G.L.'s post-lunch blood sugar checks, which would cause a notification to her resulting in her reviewing the protocol with SCS staff.  Thus, it is inaccurate for Plaintiffs to suggest that there was routinely inadequate supervision of G.L. during lunch.  In fact, the one time, and the only time, he did not eat his lunch, his low blood sugar was picked up by his reading at home, Lowry emailed the school, and a review of the protocol occurred.

There is no evidence that SCS failed to reasonably accommodate G.L.'s diabetes by not having a protocol or not adequately supervising him.  There is also no evidence that the single failure to ensure that he ate his lunch resulted in an exclusion from participation in or the denial of the benefits of SCS's services, programs, or activities.  Summary judgment is granted to

Defendants on G.L.'s reasonable accommodation claim.

Plaintiffs argue in their response to the motion that G.L. should be allowed to assert his disability discrimination claims as retaliation claims, not reasonable accommodation discrimination claims. They contend that requesting reasonable accommodation for a disability is protected conduct under the ADA and the Rehabilitation Act and that as a result of engaging in this protected conduct, adverse retaliation actions were taken against G.L. in the form of inadequate supervision of his diabetes management and disciplining him for checking his blood sugar. Pls.' Resp. at 26-27. Even if I were inclined to allow Plaintiffs to amend their theory at this point, which I am not, the record does not support Plaintiffs' retaliation allegations as explained above. Even when construed in a light most favorable to Plaintiffs, the evidence does not suggest that SCS inadequately supervised G.L.'s diabetes management or disciplined him for checking his blood sugar. Thus, there is no issue of fact regarding any "adverse actions" allegedly taken against G.L.[7]

## VII.  Federal Funding

To prevail on a Title IX or section 504 Rehabilitation Act claim, a plaintiff has to show that the defendant receives federal financial assistance. Davis, 526 U.S. at 640-42 (Title IX); U.S. Dep't of Transp. v. Paralyzed Veterans of Am., 477 U.S. 597, 604 (1986) (Rehabilitation Act). In interpreting the applicable statutory language, cases have established that a "program or activity" may be considered to have received federal financial assistance even if it receives money indirectly, as long as that program or activity is the intended recipient of that assistance,

---

[7]  As with the Title IX claims, the Rehabilitation Act claim is alternatively dismissed based on the federal funding issue discussed below.

50 - OPINION & ORDER

but not if that program or activity merely benefits from the aid. Paralyzed Veterans, 477 U.S. at

607 (explaining that the Rehabilitation Act "covers those who receive the aid, but does not

extend as far as those who benefit from it."); Grove City Coll. v. Bell, 465 U.S. 555, 559 (1984)

(recognizing that Title IX coverage extends to the intended recipient of aid whether receiving the

federal funds indirectly or directly).

     In a more recent Ninth Circuit case discussing the issue, the court considered a decision

by Judge Brown in which she granted summary judgment to the Defendant after remarking that

the plaintiff was "confusing intended beneficiaries with intended recipients" and concluding that

the entity did not receive federal financial assistance within the meaning of the Rehabilitation

Act. Sharer v. Oregon, No. 03:04-cv-01690-BR, 2006 WL 1805956, at *5 (D. Or. June 28,

2006), aff'd, 581 F.3d 1176 (9th Cir. 2009). In analyzing the issue on appeal, the Ninth Circuit

noted that "[w]hether a particular state entity is a program or activity receiving federal financial

assistance within the meaning of section 504, though itself a question of federal law, can be

answered only after considering the provisions of state law that define the agency's character."

581 F.3d at 1178 (internal quotation marks, brackets, and ellipsis omitted). Based on its

examination of the state law at issue in Sharer, the Ninth Circuit concluded that the entity at issue

was not a "program or activity" receiving federal financial assistance within the meaning of the

Rehabilitation Act. Id. at 1180.

     In support of their position that SCS receives no federal funding, Defendants rely on the

Declaration of Phil Johanson, Chief Financial Officer of the District, and the deposition

testimony of Kim Young, the SCS Board Treasurer. Johanson explains that he is familiar with

the funding sources for the schools in the Sherwood School District, including SCS. Johanson

Decl. at ¶ 4.  Because the District is the sponsor of SCS, the District contracts with SCS to pay

for educational services.  Id.  The payment must equal an "amount per weighted average daily

membership (ADMw) that is at least equal to 80 percent of the amount of the school district's

General Purpose Grant per ADMw for students in grades K-8."  Id.

   Attached to Johanson's Declaration are copies of spreadsheets showing payments by the

District to SCS for the 2011-12 and 2012-13 school years.  Exs. A, B to Johanson Decl.

Johanson states that if SCS had received federal money, it would be reflected in payments to the

school under the headings of "Edu Jobs" or "State Fiscal Stabilization Fund."  Johanson Decl. at

¶¶ 6, 8.  Funds paid as "SYS Funds" are not federal money.  Id. at ¶ 6.  He affirmatively states

that to the best of his knowledge, SCS did not receive any federal funding for the 2011-12 and

2012-13 school years.  Id. at ¶ 9; Exs. A, B. to Johanson Decl..

   Young was responsible for monitoring SCS's budget.  Young Depo. (Ex. D to Sherman

Reply Decl.) at 35-36.  She states that SCS receives "the funding that goes from the Oregon

Department of Education to Sherwood School District to Sherwood Charter School."  Id. at 37-

38.  Young's understanding is that SCS does not receive any federal funding.  Id.

   Plaintiffs rely on excerpts from the District's Adopted Budget for 2011-12 and the

District's Comprehensive Annual Financial Report for the year ending June 30, 2012.  Exs. 1, 2

to Brague Decl.  The 2011-12 Adopted Budget shows that in that school year, there were four

"fund groups" from which the District expended money:  General Fund, Special Revenue Fund,

Debt Service Funds, and Capital Projects Fund.  Ex. 1 to Brague Decl. at 5; see also Ex. 2 to

Brague Decl. at 5 (Financial Report showing the four fund groups).  The Adopted Budget shows

an approved anticipated payment to "Charter Schools" for the 2011- 12 school year in the amount

of $826,084 from the District's General Fund.  Ex. 1 to Brague Decl. at 6.[8]  The Financial Report shows that the District's General Fund received $14,102 in federal source monies in the year ending June 30, 2012.  Ex. 2 to Brague Decl. at 6.

Based on these documents, Plaintiffs maintain that the evidence shows that (1) federal money goes into the District's General Fund; (2) the District has paid SCS through its General Fund a percentage of ADMw based on annual enrollment; (3) thus, SCS receives federal money. They assert that while it may be true that SCS does not receive funds directly from federal sources in the form of specific funding grants, as the District does, SCS nonetheless receives regular payments from the District's General Fund which contains "unrestricted, comingled Federal monies."  Pls.' Resp. at 9.

Notably, the Adopted Budget and Financial Report relied on by Plaintiffs provide information only as to the 2011-12 school year when no actionable conduct occurred.  The only event occurring in the 2011-12 school year is the February 28, 2012 email from Lowry asking that T.L. and K.L. be separated, which they were and which resolved the situation.

Moreover, the documents regarding the 2011-12 school year fail to create an issue of fact regarding SCS's receipt of federal funding in the 2012-13 school year.  Even if the $14,102 federal source money in the District's General Fund for the 2011-12 school year and the District's payment to SCS of more than $800,000 from its General Fund in the 2011-12 school year could be said to raise an inference that SCS indirectly received federal funds in the 2012-13 school year, the state statutes governing funding for charter schools, coupled with the testimony of

---

[8]  Johanson's spreadsheet shows that $867,703 was actually paid for the 2011-12 school year.  Ex. A to Johanson Decl. at 11.

Johanson and Young, negate that inference.

Oregon Revised Statutes §§ (O.R.S.) 338.155 - 338.165 address the funding of public charter schools.  O.R.S. 338.155 governs the distribution of State School Funds to public charter schools.  Under subsection (2), the school district "shall contractually establish, with any public charter school that is sponsored by the board of the school, payment for provision of educational services to the public charter school's students."  O.R.S. 338.155(2).  Next, the law mandates that "payment shall equal an amount per weighted average daily membership (ADMw) of the public charter school that is at least equal to: (a) Eighty percent of the amount of the school district's General Purpose Grant per ADMw as calculated under ORS 327.013 for students who are enrolled in kindergarten through grade eight[.]" O.R.S. 338.155(2)(a).  O.R.S. 327.013 provides the formulas for the distribution of State School Funds to school districts, including the formula for the "General Purpose Grant."  O.R.S. 327.013(1).  The State School Fund is a fund in the state's "General Fund" and consists of "moneys appropriated by the Legislative Assembly and moneys transferred from the Education Stability Fund."  O.R.S. 327.008.

Under these statutes, a district must pay the charter school eighty percent of the amount of what the district receives from the state under the General Purpose Grant per "ADMw." Johanson's exhibits show that for the 2011-12 school year, SCS anticipated having 159 students in grades 1-8, and then counted 11 for the 22 kindergarten students.  Ex. A to Johanson Decl. at 1; see also Ex. 1 to Brague Decl. at 9 (kindergarten students counted at .5 rate).  The total count is 170 and thus, for the 2011-12 school year, the District expected the ADMw for SCS to be 170 (based on figures from the prior year's enrollment with updated figures to come).  Ex. A to Johanson Decl.; see also Ex. 1 to Brague Decl. at 9 (2011-12 Adopted Budget showing 192

ADM based on 181 students in grades 1-8 with 22 kindergarten students adding an additional

11). Thus, under the controlling statutory law, the District receives money from the state under

the General Purpose Grant of the State School Fund in an amount based on the District's ADMw

and then remits eighty percent of that figure to SCS based on SCS's own ADMw. That is what

occurred in the 2011-12 and 2012-13 school years. Exs. A, B. to Johanson Decl.

Given the statutory scheme and considering Johanson's and Young's testimony that the

money paid to SCS is out of the State School Fund and includes no federal money, even with the

documents showing that in the 2011-12 school year the District received $14,102 into its General

Fund and SCS was paid out of the District's General Fund, Plaintiffs fail to create an issue of fact

that SCS was an intended recipient of federal money. Johanson's documents show that the

payments to SCS were from the State School Fund which is consistent with state law mandating

payments from that Fund to a charter school but requiring nothing more from the District to SCS.

At oral argument, Plaintiffs raised, for the first time, an argument that SCS is a "program

or activity" receiving federal financial assistance because Raibley, the education aide provided to

supervise K.L., was hired with federal money under the Individuals with Disabilities Education

Act (IDEA).[9] Specially, Plaintiffs cited to 20 U.S.C. § 1413(a)(5) and 34 C.F.R. § 280 in support

of their argument. The regulation reference is to magnet schools, not charter schools. The

---

[9] Plaintiffs make one reference in their Response Memorandum to the IDEA. Pls.' Resp.
at 9. But, it was one of several federal statutes contained in a string, without citation, to support
a statement that the District received federal money specifically earmarked and tracked for
certain uses. From this statement, Plaintiffs argued that while Defendants did not receive funds
directly from federal sources in the form of specific grants like the District did, Defendants did
receive regular payments from the District's General Fund which contained unrestricted, co-
mingled federal money. The IDEA argument and the citations provided at oral argument were
entirely new.

statutory reference states that to be eligible for "assistance under this subchapter," the "local

educational agency" must serve children with disabilities attending "charter schools that are

public schools of the local educational agency" in the same manner as the local educational

agency serves children with disabilities in its other schools and provide funds "under this

subchapter" to those charter schools on the same basis as the local educational agency provides

funds to that agency's other public schools.  20 U.S.C. § 1413(a)(5).

       Plaintiffs made no attempt to establish that the District is a "local educational agency"

within the meaning of the statute or that SCS is a "public school of the local educational

agency[.]"  Even if they did, Plaintiffs fail to establish that SCS received funds "under this

subchapter" which refers to 20 U.S.C. §§ 1411-1427.  Under section 1411, the Secretary of

Education provides grants to "States, outlying areas, and freely associated States," and provides

"funds to the Secretary of the Interior" to assist in providing special education and related

services to children with disabilities.  20 U.S.C. § 1411(a)(1).  Under section 1412, a state is

eligible for assistance "under this subchapter" if it submits a plan with certain assurances

showing that the state has policies and procedures in place to meet several conditions specified in

the statute.  20 U.S.C. § 1412(1).  Under 20 U.S.C. § 1413, a local educational agency is eligible

for assistance "under this subchapter" for a fiscal year if the agency submits a plan that provides

assurances to the State educational agency that the local educational agency meets certain

conditions.  20 U.S.C. § 1413(a).  One of those conditions is that the local educational agency

serve children with disabilities in "charter schools that are public schools of the local educational

agency" in the same manner as it serves children in other schools and provides funds under this

subchapter on the same basis to those charter schools as it does to the agency's other public

56 - OPINION & ORDER

schools.  20 U.S.C. § 1413(a)(5).

Simply citing to this statute in oral argument does not establish that SCS received federal funding in the 2012-13 school year.  The record does show that under its "Special Revenue Funds," the District budgeted for "IDEA Fund 261" for the 2011-12 school year.  Ex. 1 to Brague Decl. at 4, 7-8.  It also shows that the District received $631,241 in IDEA grant money from the federal Department of Education passed through the Oregon Department of Education in the 2011-12 school year.  Ex. 2 to Brague Decl. at 10.  Nonetheless, the records do not establish that any of this money went into the District's General Fund, the only source of money the District provided to SCS.[10]  Finally, Plaintiffs fail to show that Raibley was paid out of IDEA funds.  And, in the end, even if Raibley was paid out of IDEA funds, SCS is a beneficiary of those federal funds, not an intended recipient of them.

In summary, Plaintiffs fail to create an issue of fact regarding SCS's receipt of federal funding.  The only evidence Plaintiffs provide relates to the 2011-12 school year when no actionable conduct occurred.  Even if that evidence were capable of creating an issue of fact regarding the funding for the 2012-13 school year, the record establishes that the only funds provided to SCS by the District were from the State School Fund based on the state mandated funding formula.  Plaintiffs' last minute argument regarding the IDEA is unavailing in the absence of evidence showing that IDEA funds were included in the General Fund and showing

---

[10]  See also O.R.S. 338.165 (addressing funding for special education students attending public charter schools and providing that the school district in which such a charter school is located shall receive funding for charter school special education students from the State School Fund).

that Raibley was paid with IDEA grant money.[11]

Because I agree with Defendants on the federal funding issue, I decline to address the

argument that the SCS Board is an improper Defendant.

CONCLUSION

Defendants' summary judgment motion [46] is granted.

IT IS SO ORDERED.

Dated this ____18____ day of ____Dec._____, 2014

_____
Marco A. Hernandez
United States District Judge

---

[11]  I also reject Plaintiffs' "third-party beneficiary" contract argument because Plaintiffs never brought a breach of contract claim, the contractual provisions cited are limited by language that SCS was bound by federal law only if it otherwise applied, and as to the language regarding the Rehabilitation Act, that claim does not survive summary judgment for the reasons previously discussed.